1  WO

2

3

4

5               IN THE UNITED STATES DISTRICT COURT

6                 FOR THE DISTRICT OF ARIZONA

7

8  DANIEL B. MEYER,              )
                                 )
9          Plaintiff,            )
                                 )
10         v.                    )      CIV 07-00293 PHX MEA
                                 )
11 MICHAEL J. ASTRUE,            )      MEMORANDUM & ORDER
   Commissioner of              )
12 Social Security,             )
                                 )
13         Defendant.            )
   _____ )

14

15         The parties have consented to have all proceedings in

16  this case conducted before a United States Magistrate Judge

    pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of
17
    Civil Procedure.
18
           Plaintiff, Mr. Daniel Meyer, who is represented by
19
    counsel and proceeding *in forma pauperis*, brought this action
20
    pursuant to 42 U.S.C. § 405(g), seeking judicial review of the
21
    final decision of the Commissioner of the Social Security
22
    Administration, Defendant Michael Astrue (the "Commissioner"),
23
    denying Plaintiff's claim for disability insurance benefits and
24
    for Supplemental Security Income benefits, pursuant to Title II
25
    of the Social Security Act, codified at 42 U.S.C. §§ 401-33,
26
    1381-83 (2003 & Supp. 2007).
27

28

1        **I  <u>Procedural History</u>**

2            Plaintiff filed an application for Social Security

3    disability insurance benefits and Supplemental Security Income

4    ("SSI") benefits in February of 2003, alleging an onset of

5    disability as of February 19, 2002.  Administrative Record on

6    Appeal ("R.") (Docket No. 12A) at 67-69 & 552-55.  Plaintiff

7    alleged he was disabled due to anxiety, depression, ADHD,

8    hepatitis C, and a ruptured disc in his lower back.  <u>Id.</u> at 79.

9    Plaintiff's applications for benefits were denied initially and

10   on appeal.  <u>Id.</u> at 32-49, 55-59, 556, 561.  Plaintiff requested

11   a hearing regarding his eligibility for benefits, which was

12   conducted before an Administrative Law Judge ("ALJ") on January

13   25, 2005.  <u>Id.</u> at 566-86.

14           The ALJ determined Plaintiff was not disabled as that

15   term is defined by the federal statutes and denied benefits in

16   a decision entered March 18, 2005.  <u>Id.</u> at 26-33.  Plaintiff

17   sought review of this decision by the Social Security Appeals

18   Council.  <u>Id.</u> at 26-29.  The Appeals Council denied review of

19   the ALJ's decision, rendering the ALJ's decision the final

20   decision of Defendant, the Commissioner of the Social Security

21   Administration, for purposes of judicial review.  <u>See</u> 20 C.F.R.

22   § 404.981 (2007).

23           Plaintiff filed a Complaint for Judicial Review of

24   Administrative Determination of Claim for Social Security

25   Disability Benefits on February 8, 2007.  Plaintiff alleges the

26   ALJ erred in her findings of fact and application of the law

27   when concluding Plaintiff was not disabled as that term is

28   defined by the Social Security statutes.

                                  -2-

## II  **Standard of review**

The Court's jurisdiction extends to review of the final decision of Defendant denying Plaintiff's application for Social Security disability benefits and SSI benefits, pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g).  Plaintiff and Defendant have filed motions seeking judgment as a matter of law.  See Docket No. 16 & Docket No. 23.

Judicial review of a decision of the Commissioner is based upon the pleadings and the record of the contested decision.  See 42 U.S.C. § 405(g) (2003 & Supp. 2007).  The scope of the Court's review is limited to determining whether the Commissioner, i.e., the ALJ, applied the correct legal standards to Plaintiff's claims and whether the record as a whole contains substantial evidence to support the ALJ's findings of fact.  See id. § 423; Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005); Bustamante v. Massanari, 262 F.3d 949, 953 (9th Cir. 2001).  However, if an ALJ's legal error was harmless, i.e., there is substantial evidence in the record to support the ALJ's conclusion on the challenged issue absent the legal error, the case need not be remanded for further proceedings.  See Batson v. Commissioner of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004); Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990); Booz v. Secretary of Health & Human Servs., 734 F.2d 1378, 1380 (9th Cir. 1984).

The Ninth Circuit Court of Appeals has stated an error is harmless if it does not "materially impact" the ultimate disability determination or if the error is not prejudicial to the claimant, including when the error is made at a step of the

sequential process the ALJ was not required to take.  See, e.g., Robbins v. Social Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006) (stating: "we have only found harmless error when it was clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination,'"); Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1055-56 (9th Cir. 2006).

Satisfying the substantial evidence standard requires more than a mere scintilla but less than a preponderance of evidence.  See, e.g., Bustamante, 262 F.3d at 953.  Substantial evidence has been defined as the amount of relevant evidence a reasonable mind would accept as adequate to support a conclusion.  See, e.g., Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006); Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999).  Evidence is insubstantial if it is overwhelmingly contradicted by other evidence in the administrative record. See Threet v. Barnhart, 353 F.3d 1185, 1189 (10th Cir. 2003); Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983); Cullen v. Astru, 480 F. Supp. 2d 1258, 1262 (D. Kan. 2007) ("The determination of whether substantial evidence supports the Commissioner's decision, however, is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion"); Robison v. Barnhart, 316 F. Supp. 2d 156, 163 (D. Del. 2004); Rodriguez v. Barnhart, 252 F. Supp. 2d 329, 332 (N.D. Tex. 2003); Rieder v. Apfel, 115 F. Supp. 2d 496, 501 (M.D. Pa. 2000).  If the evidence with regard to an issue is in equipoise, the Court must affirm the decision of the ALJ.  See, e.g., Bustamante, 262 F.3d at 953; Gwathney v. Chater, 104 F. 3d 1043,

-4-

1045 (8th Cir. 1997); <u>Books v. Chater</u>, 91 F. 3d 972, 977-78 (7th Cir. 1996).   <u>But</u> <u>see</u> <u>Binion v. Chater</u>, 108 F.3d 780, 782 (7th Cir. 1997).   Additionally, "[w]hile inferences from the record can constitute substantial evidence, only those 'reasonably drawn from the record' will suffice."   <u>Widmark</u>, 454 F.3d at 1066, <u>quoting</u> <u>Batson</u>, 359 F.3d at 1193.

Because the ALJ is responsible for weighing the evidence, resolving conflicts, and making independent findings of fact, the Court may not decide the facts anew, re-weigh the evidence, and decide whether a claimant is or is not disabled. <u>See</u> <u>Lewis v. Apfel</u>, 236 F.3d 503, 509 (9th Cir. 2001); <u>Powers v. Apfel</u>, 207 F.3d 431, 434-35 (7th Cir. 2000).   As stated <i>supra</i>, if the evidence can support either outcome, the reviewing court may not substitute its judgment for that of the ALJ, but must affirm the ALJ's decision.   <u>See</u> <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005); <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1201 (9th Cir. 2001); <u>Casey v. Secretary of Health & Human Servs.</u>, 987 F.2d 1230, 1233 (6th Cir. 1993).

### III   <u>Statement of the Law</u>

Title II and Title XVI of the Social Security Act provide for the payment of benefits to individuals who suffer from a "disability."   <u>See</u> 42 U.S.C. §§ 423(a)(1)(D) & 1381-1383 (2003 & Supp. 2007).   To be eligible for Title II disability insurance benefits, the claimant must demonstrate they were "disabled" on or before the date they were "last insured" for Title II benefits.   <u>See</u>, <u>e.g.</u>, <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1077 n.7 (9th Cir. 2002); <u>Ball v. Massanari</u>, 254 F.3d 817,

819 (9th Cir. 2001).[1]

To establish eligibility for disability benefits under the Social Security Act, the claimant must show that: (1) he suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months, see 42 U.S.C. § 423(d)(1)(A) (2003 & Supp. 2007); and (2) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. See id. § 423(d)(2)(A). If a claimant meets both of these requirements, he is by definition "disabled." See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

The Social Security Administration regulations prescribe a five-step sequential process for determining whether a claimant is "disabled." See 20 C.F.R. § 404.1520 (2007). If a claimant is found to be "disabled" or "not disabled" at any step in the sequential process, there is no need to proceed to the subsequent step(s). See id.

First, the claimant must establish he is not gainfully employed at the time of his application. See 20 C.F.R. § 404.1520(a)(4)(i) (2007). Next, the claimant must be suffering from a "medically severe" impairment or "combination of impairments." Id. § 404.1520(a)(4)(ii). The third step is to

---

[1] Supplemental Security Income benefits are for the "needy disabled," and the applicant is not required to have worked to receive these benefits. Chester v. Heckler, 610 F. Supp. 533, 534 (D. Fla. 1985).

determine whether the claimant's impairment meets or equals one of the "listed" impairments included in Appendix 1 to this section of the Code of Federal Regulations. See id. § 404.1520(a)(4)(iii).  If the claimant's impairments meet or equal one of the impairments listed in Appendix 1, the claimant is conclusively "disabled." See id. The fourth step of the process requires the ALJ to determine whether the claimant, despite his impairment, can perform work similar to work he has performed in the past.  A claimant whose "residual functional capacity" allows him to perform "past relevant work" despite his impairments, will be denied benefits. See id. § 404.1520(a)(4)(iv).

The claimant bears the burden of proving disability with regard to the first four steps of the evaluation. See Andrews v. Shalala, 53 F.3d 1035, 1040 (9th Cir. 1995).  If the claimant cannot perform his past relevant work, at step five the burden shifts to the Commissioner to demonstrate the claimant can perform other substantial gainful work that exists in the national economy, given his residual functional capacity. See 20 C.F.R. § 404.1520(a)(4)(v); Tackett, 180 F.3d at 1098.

When assessing a claimant's residual functional capacity, the Commissioner must consider the record opinions of physicians.  Social Security Administration regulations distinguish among the opinions of three types of physicians regarding a claimant's residual functional capacity: (1) those who treat the claimant (the "treating" physicians); (2) those who examine but do not treat the claimant (the "examining" physicians); and (3) those who neither examine nor treat the

claimant, but who review the claimant's file (the "nonexamining" or "reviewing" physicians). <u>See</u> 20 C.F.R. § 404.1527(d) (2007); <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995). Generally, in determining whether a claimant is disabled, i.e., in assessing a claimant's residual functional capacity, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's. <u>See</u> 20 C.F.R. § 404.1527(d) (2007); <u>Lester</u>, 81 F.3d at 830. The Social Security Administration regulations also instruct adjudicators to give greater weight to medical opinions that are explained than to those that are not explained, <u>see</u> 20 C.F.R. § 404.1527(d)(3) (2007), and to the opinions of specialists concerning matters relating to their specialty over those of nonspecialists. <u>See</u> <u>id.</u> § 404.1527(d)(5). <u>See</u> <u>also</u> <u>Holohan</u>, 246 F.3d at 1201-02; <u>Saelee v. Chater</u>, 94 F.3d 520, 522 (9th Cir. 1996).

**IV   Statement of Facts**

Plaintiff was born in 1961. Plaintiff served in the United States military from February of 1980 through February of 1983, and was honorably discharged from this service. <u>Id.</u> at 575. Plaintiff completed a General Equivalency Degree in 1981. <u>Id.</u> at 85. Plaintiff's date last insured for Title II benefits was December 31, 2007. <u>Id.</u> at 569. Plaintiff's application for disability benefits, filed February 20, 2003, alleged he became unable to work on February 19, 2002, due to anxiety, depression, ADHD, Hepatitis C, and a ruptured disc in his lower back. <u>Id.</u> at 79.

A "PLC CPC", Mr. Wayne Formica, a service provider at Value Options, conducted a mental status examination of Plaintiff on March 18, 2002. Id. at 129-38 (captioned as an "Adult Intake Assessment").[2] Mr. Formica determined that Plaintiff's thought processes were logical, his thought content was appropriate, his perception was normal, his concentration was good, his memory was intact, and his judgment and insight were good. Id. at 138. Mr. Formica noted Plaintiff was anxious, which was aggravated "by the fact that he lost his job recently and then his car was stolen last week." Id. at 130. Plaintiff reported feeling guilty and depressed, and stated he was experiencing poor concentration and racing thoughts, and having difficulty making decisions. Id. at 130. Mr. Formica reported: "judgement appeared to be good but his insight into his issues was poor." Id.

Other than hepatitis B and C, Plaintiff "denied any other major/minor medical conditions" to Mr. Formica. Id. at 131. Plaintiff reported his mental stress prevented him from working. Id. Plaintiff scored a "30" on a "Mini Mental State Exam, the maximum score indicating "no apparent impairment". Id. at 139. Mr. Formica assessed Plaintiff as suffering from an anxiety disorder, not otherwise specified, and polysubstance dependence. Id. at 141. He also opined Plaintiff was experiencing "occupational problems, problems with access to health care services," and assessed a Global Assessment of

---

[2] The Court notes the possibility that the initials might indicate Licensed Professional Counselor and "Certified Professional Counselor."

Functioning, or "GAF" score of 58.   Id.[3]

On July 8, 2002, Plaintiff presented for an intake evaluation at the Family Service Agency, a behavioral health center, complaining of rapid mood swings, impulsiveness, low stress tolerance and short attention span.   Id. at 454. Plaintiff was not taking medication at that time, although he had previously taken Wellbutrin, Divalproex (depakote), and Trazadone.   Id.   Plaintiff complained he was experiencing symptoms of ADHD.   Id.   Plaintiff informed the clinician that he was self-medicating with alcohol and marijuana and unable to maintain employment.   Id. at 454.   On August 12, 2002, Plaintiff was again seen at the Family Service Agency, and appeared more relaxed with slower speech.   Id. at 450.   Plaintiff was also concerned about jail, getting a job or attending school.   Id. at 449.   On August 28, 2002, the Family Service Agency clinician noted Plaintiff had begun taking Remeron, which was helping his mental symptoms but causing him to be sleepy.   Id. at 448.

On September 26, 2002, Plaintiff reported to his Family Service Agency clinician that the medicine was "helping him and sees positive difference in being more calm, less anxious."   Id. at 446.   On October 10, 2002, the clinician noted Plaintiff had "almost everything in order for month in jail ... appear[ance]

_____

[3] The GAF is one of the five axes of the diagnostic system described in the Diagnostic and Statistical Manual of Mental Disorders (4th edition), the "DSM-IV", and considers psychological, social, and occupational functioning.  A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."  DSM-IV at 30.  A GAF score of 21-40, on a 100 point scale, indicates multiple symptoms affecting all levels of functioning and a GAF score of 41-70 indicates severe symptoms or serious impairments in social or occupational functioning.

is relaxed." <u>Id.</u> at 445.

Plaintiff was seen by Dr. Skelly, a medical doctor, on November 8, 2002. <u>Id.</u> at 150. Plaintiff complained of severe back pain, and reported he had been working "7 hours per day in tent city in the kitchen." <u>Id.</u> at 149. Plaintiff reported his left leg was "going numb." <u>Id.</u> at 149. Plaintiff also reported being depressed and stated he was taking Remeron for depression. <u>Id.</u> On November 12, 2002, Dr. Skelly contacted Plaintiff to report that X-rays of Plaintiff's lumbar spine taken November 8, 2002, indicated "some wear to the discs in his lower back [] and o/w it was normal" and advised Plaintiff to continue taking Bextra for pain. <u>Id.</u> at 151.

On November 18, 2002, Plaintiff was seen by Dr. Quinones, an osteopathic physician. <u>Id.</u> at 145. Plaintiff complained of lower back pain, which he described as constant and moderate, resulting in numbness in his left leg. <u>Id.</u> at 143. The doctor prescribed Flexeril for the pain. <u>Id.</u> at 145.

On November 21, 2002, Plaintiff was seen by Dr. Shapiro for an orthopedic consultation. <u>Id.</u> at 164-65. Dr. Shapiro noted Plaintiff's x-rays indicated mild degenerative disc disease and concluded that he was not "impressed with any other objective findings." <u>Id.</u> at 165.

A magnetic resonance image ("MRI") taken of Plaintiff's spine on December 3, 2002, showed a herniated disc protrusion at the L4-L5 level on the left, with no evidence of spinal stenosis. <u>Id.</u> at 167.

Plaintiff was seen at the Family Service Agency on December 30, 2002. <u>Id.</u> at 443. Plaintiff's mental condition

-11-

seemed to have improved, with the clinician reporting Plaintiff had exercised assertiveness skills with his family over the holidays and that "this felt good." Id. at 443. On January 13, 2002, Plaintiff told the clinician he had over-indulged in alcohol on New Year's Eve and "felt bad [the] next day." Id. at 442. Plaintiff expressed a desire to "cut down" on his alcohol consumption. Id.

On January 27, 2003, Plaintiff reported to the Family Services Agency clinician that he was "not as concerned as before about health issues," and the clinician noted Plaintiff "smiles when talking about being assertive." Id. at 441. On February 10, 2003, the clinician noted Plaintiff had decreased his caffeine and alcohol intake and was "feeling calmer and in more control." Id. at 440.

Plaintiff's application for disability benefits, filed February 20, 2003, alleged he became unable to work on February 19, 2002, due to anxiety, depression, ADHD, Hepatitis C, and a ruptured disc in his lower back. Id. at 79. Plaintiff stated he was unable to sit for lengthy periods of time due to his ADHD and that he was unable to stand for long periods due to the ruptured disc. Id. Plaintiff alleged his conditions first bothered him in August of 1999, and that he became unable to work and last worked in February of 2002. He stated he had stopped working because he was "Terminated." Id. Plaintiff alleged in his disability application that he had worked from 1986 through 2002 as a travel agent. Id. at 80.

At that time, in February of 2003, Plaintiff listed his medications as Remeron, for depression, and Flexeril for his

back pain.  Plaintiff reported the Remeron caused weight gain, and reported no side effects from the Flexeril.  Id. at 84 & 91. In his application Plaintiff stated his back pain was not constant and that it was sufficiently controlled by medication, although he couldn't stand for "too long or lift more than 20 lbs."  Id. at 86.  Plaintiff also noted he had been admitted to a Veterans Administration hospital mental health ward for one week due to suicidal ideation and depression.  Id. at 87. Plaintiff anticipated beginning interferon treatment for hepatitis C in April of 2003.  Id. at 87.

In an Activities of Daily Living Questionnaire dated March 18, 2003, Plaintiff stated that, on a daily basis, he would make breakfast, lunch, and dinner, and clean the kitchen after each meal.  Id. at 91.  Plaintiff asserted cleaning and cooking made his back ache if he stood for too long, bent over, or lifted "too much."  Id.  Plaintiff indicated he had to take breaks throughout the day so his back wouldn't hurt.  Id. at 91. Plaintiff stated he took Flexeril as needed and Remeron at bedtime.  Id. at 92.  Plaintiff stated he lived alone and did his own cooking, cleaning, and grocery shopping, and that he socialized a few times a week.  Id. at 92.  Plaintiff stated he no longer bowled because of his back pain and that he watched television as a hobby.  Id. at 93.  Plaintiff stated he did not drive because: "car stolen & DUI, lost license."  Id. at 93. Plaintiff stated he had not worked since his alleged date of onset of disability because he "got fired, I was overwhelmed by my responsibilities."  Id. at 93.

Plaintiff's significant other completed an Activities of Daily Living Questionnaire to Third Party on March 18, 2003. Id. at 100.  This person reported Plaintiff had received three DUIs and was a recovering crack cocaine addict.   Id.   This individual stated Plaintiff had been treated for depression, an anxiety disorder, obsessive compulsive behavior, and ADHD.  Id. This  person  averred  Plaintiff's  "problems  have  grown progressively worse in the 17 1/2 years I've known him.  He has been homeless, and suicidal in the last couple of years.  Now that he is getting some help, he does seem to be improving." Id. at 100.

On March 19, 2003, Russell Horning, a psychiatric Nurse Practitioner at the Family Services Agency, completed a Mental Impairment report.  Id. at 367.[4]  Mr. Horning stated Plaintiff displayed  hyperactivity,  anxiety,  "pressurred  speech," distractability, hyperphagia, negativity, "compulsivity" and "impulsivity." (sic)  Id.  Mr. Horning noted Plaintiff had been previously treated by the Veterans Administration "for bipolar disorder and substance dependence."  Id.  He noted Plaintiff had been previously treated with Depakote and Wellbutrin.  Id.  Mr. Horning noted Plaintiff "had 2 DUIs & another incarceration related to weapons associated with drugs in 1998."  Id.  Mr. Horning stated Plaintiff displayed negativity, and that he was "easily overwhelmed, anxious  frequently worries about issues out of his control."  Id. at 388.

---

[4] The Court notes Plaintiff was seen at the Family Services Agency by a CPC CSAC, Karen Theoharotos (the spelling of the last name is not clear), from July 2002 through September of 2003, as indicated by Ms. Theoharotos' name on the progress notes.  See R. at 429-54.

The nurse practitioner also reported Plaintiff "does not seem to recall some details from visit to visit," and opined his ability to understand and remember detailed instructions "would require frequent reinforcement." Id. The clinician also noted Plaintiff's abilities were limited, *inter alia*, with regard to carry out detailed instructions, maintain attention and concentration, and to get along with coworkers without distraction. Id. at 389. Mr. Horning opined Plaintiff was "not likely to maintain full time schedule or [attendance]" and that Plaintiff was "easily overwhelmed and sensitive to negative feedback." Id. He further noted that, although Plaintiff had a problem at times with spending and that he "often spends all free money impulsively" he was capable of managing his benefit payments. Id. at 390. Mr. Horning checked boxes on a form indicating Plaintiff had informed him he had schizophrenia, and that, in his medical opinion, Plaintiff suffered from schizophrenia. Id. at 391.

Clinician's notes dated April 20, 2003, from the Family Service Agency indicate Plaintiff had begun treatment for hepatitis C, and that his energy and appetite were better as a result of the treatment. Id. at 439. On May 5, 2003, the clinician's notes indicate Plaintiff was "feeling much better ... feeling good about progress has made in life ... smiles often ... appears motivated to continue good progress" Id. at 438.

On May 19, 2003, the Family Service Agency progress notes indicate Plaintiff was feeling "okay but experiencing more periods of sadness." Id. at 437.

On May 20, 2003, Dr. Jose Amato, a psychiatrist, completed a Psychiatric Review Technique analysis of Plaintiff's medical records and a Mental Residual Functional Capacity Assessment of Plaintiff's ability to do specific work-related activities. Id. at 168-84. The doctor noted Plaintiff's history of major depressive disorder and anxiety disorder. Id. at 168. The doctor noted Plaintiff was cognitively intact, and opined he appeared to be cable of work in a low-stress environment, "doing unskilled simple work with very limited contact with the general public." Id. at 180 & 184. With regard to Plaintiff's functional capacity, Dr. Amato opined Plaintiff's ability to remember detailed instructions was moderately limited, as was his ability to maintain attention and concentration for extended periods. Id. at 184. The doctor also concluded that Plaintiff's ability to maintain a schedule, to sustain a routine without supervision, and to work with others without being distracted, were all moderately limited. Id. at 182-83. Otherwise, the doctor opined, Plaintiff's mental condition did not significantly limit his ability to do work-related tasks. Id. at 182-83.

On June 2, 2003, the progress notes from Family Service Agency indicates Plaintiff continued to feel better, and that he smiled often, laughed, and joked. Id. at 436.

Plaintiff was examined by Dr. Cunningham, M.D., on June 19, 2003. Id. at 186-91. Dr. Cunningham noted Plaintiff's range of motion and motor examination were within normal limits. Id. at 188. Dr. Cunningham diagnosed hepatitis C with no overt liver decompensation on examination, lower back pain with a

history of ruptured lumbar disc with nonfocal neuromuscular examination, no evidence of focal neuromuscular deficits, and a history of polysubstance abuse, currently abstinent. Id. at 188. Dr. Cunningham opined that Plaintiff could lift and carry ten pounds frequently and fifty pounds occasionally, could frequently balance, could occasionally climb, stoop, kneel, crouch, and crawl, and was restricted from exposure to hazardous heights and extreme temperatures. Id. at 191.

On June 23, 2003, Plaintiff reported weight loss to the Family Service Agency clinician. Id. at 435. Plaintiff had become anemic, although the clinician noted he was "utiliz[ing] coping skills for anxiety and relaxation." Id. at 435.

On July 14, 2003, Plaintiff reported to the Family Service Agency that he had been feeling more depressed the past few weeks, getting easily frustrated, and having crying spells. Id. at 434. Plaintiff reported his doctor's nurse had told him "this is common behavior at this halfway mark for hep C treatment." Id. at 434.

Plaintiff's applications for disability insurance and SSI benefits were denied in a decision issued July 14, 2003. Id. at 25 & 556. Plaintiff acquired counsel on or about August 20, 2003. See id. at 41-44.

On July 28, 2003, Plaintiff told his Family Service Agency clinician he was upset because his applications for Social Security benefits had been denied. Id. at 433. However, Plaintiff also reported he was "not having as many 'down' times." Id.

On November 17, 2003, a reviewing psychiatrist, Dr. Szekely, completed a residual functional capacity assessment regarding Plaintiff's mental disabilities and also completed a Psychiatric Review Technique form. See id. at 459-76. Dr. Szekely opined Plaintiff suffered from the medical disorders ADHD, and an affective disorder, not otherwise specified, and a personality disorder in the form of maladaptive traits, and polysubstance abuse. Id. at 463. Dr. Szekely noted Plaintiff's testing at the VA hospital in December of 2002, and indicated Plaintiff had impulse control problems and a problem coping which was "not 'organic.'" Id. at 464. Dr. Szekely opined Plaintiff's "nurse" and he were using the "wrong word 'OCD' to refer to his impulsivity," noting the VA hospital testing had "ruled out" OCD. Id. at 468.

With regard to Plaintiff's specific functional limitations, Dr. Szekely opined Plaintiff's mental disabilities resulted in mild restriction of his activities of daily living and moderate limitations with regard to difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation. Id. at 473. Dr. Szekely determined Plaintiff could do unskilled labor in a low-stress environment, with no supervisory responsibilities and a minimal amount of public contact. Id. at 461.

Plaintiff's applications for disability insurance and SSI benefits were denied on reconsideration on November 18, 2003. Id. at 36 & 561.

On December 8, 2003, Plaintiff was seen at the Family Service Agency by Mr. Horning. Id. at 551. Mr. Horning noted Plaintiff was restless, anxious, depressed, and irritable. Id. Mr. Horning diagnosed attention-deficit hyperactivity disorder ("ADHD") and anxiety disorder and prescribed Strattera. Id. at 551. On January 14, 2004, Mr. Horning noted Plaintiff reported a "huge improvement in concentration ... organized move to house..." Id. Plaintiff reported feeling anxiety "2-3 days/month". Id.

Plaintiff was seen at the Family Service Agency on March 10, 2004. Id. at 549. Plaintiff was irritable, anxious, and "hyperverbal." Id. Plaintiff reported being "overwhelmed by life issues." Id.

On March 17, 2004, Michaela Skelly, M.D., of the Sonoran Medical Centers, opined Plaintiff was unable to work through the end of the year. Id. at 526.[5] In a letter addressed "To whom it may concern," Dr. Skelly summarily stated: "Daniel is applying for disability and is still waiting for his hearing. He currently is unable to work and will not be able to work through the end of the year. He needs to continue with his food stamps." Id. Dr. Skelly's treatment notes of May 23, 2003, state: "completed disability paperwork–do feel it is reasonable at this time for pt to be off work starting 2/19/03 to 11/19/03." Id. at 539.

---

[5] Dr. Skelly is a physician who practiced at the Sonoran Medical Centers, and who treated Plaintiff for physical ailments from September of 2003 through December of 2003. Her notes indicate Plaintiff was a patient at the clinic beginning in February of 2001. See R. at 538.

Plaintiff was seen at the Family Service Agency on May 5, 2004.  Id. at 547.  Mr. Horning noted Plaintiff's concentration was fair, his mood was improved, and that Plaintiff was "less hyperactive ... less hyperverbal ... less negativity..."  Id.  On June 9, 2004, Mr. Horning noted Plaintiff's concentration was good, that there was less "drama" in his life, and that his mood was improving on Seroquel.  Id. On August 4, 2004, Plaintiff's mood was recorded as "stable." Id. at 545.

Mr. Horning, wrote a letter dated December 29, 2004, stating Plaintiff had been his client since August of 2002.  Id. at 542.  With regard to his "perception of [Plaintiff's] current state of disability" Mr. Horning stated:

> Mr. Meyer is currently in treatment for depression, anxiety and attention deficit disorder.  Despite aggressive medication intervention and consistent counseling he has had only brief periods of time during which consideration of employment could have even been considered and I would not expect that to change any time in the next 12 months.  He has been unable to tolerate or complete the duties required to maintain even part time employment due to these conditions without putting significant strain upon himself and potentially worsening his symptoms.

Id. at 542.

Cheryl Buyama, M.D., a physician at the Sonoran Medical Centers, examined Plaintiff on August 30, 2004, because Plaintiff reported an on-going sinus infection.  Id. at 524. Dr. Buyama reported "no unusual anxiety or evidence of depression."  Id.

At the hearing before the ALJ conducted in January of 2005, Plaintiff's counsel noted Plaintiff suffered from a

combination of impairments, but that the "primary impairment is the mental impairment." Id. at 569. At that time, Plaintiff, through his counsel, indicated the "ongoing incapacitating" impairment was Plaintiff's mental condition. Id. at 570. Plaintiff testified he had been terminated from his last employment as a travel agent because he was "overwhelmed and unable to complete my tasks, I guess. That's the answer they told me." Id. at 572. Plaintiff testified that, from the time he stopped working until his interferon treatment in September of 2003 he was exhausted from his hepatitis. Id. at 573. Plaintiff stated he spent three or four hours per day lying down. Id. at 574.

With regard to his emotional issues, Plaintiff testified he could not work because of "hopelessness and insufficiency, I suppose. Just not being able to meet standards. Mistakes." Id. at 574. Plaintiff testified he was told when he was terminated from his employment that he was "hyper." Id. at 574. Plaintiff stated that he was not "able to pay attention to any one item for any length of time. And, the fact that I was so energetic I couldn't hardly sit still. I talked too much. I was described as disruptive." Id. at 574. Plaintiff stated he had been getting treatment for his problems at the Family Service Agency, beginning in August of 2002, because he had suicidal thoughts. Id. at 574-75.

Plaintiff testified that, at that time, he was taking Remeron, Strattera, and Seroquel. Id. at 576. Plaintiff testified he saw a therapist, or counselor, every two weeks. Id. at 576. Plaintiff declared that, despite this medication

and therapy, he was still depressed, anxious, hyperactive, and had panic attacks, "quite often when I'm in a group of people, at the grocery store." Id. at 576. Plaintiff testified a panic attack made him "feel like I'm being closed in ..." and that he suffered panic attacks when he was by himself, "about things going on in life, just daily life." Id. at 576-77. Plaintiff stated he lived in a house with a roommate. Id. at 577 & 582.

Plaintiff testified that he was not involved in housework or preparing meals, and that a typical day comprised: "I get up in the morning and have my breakfast, watch the news for a few minutes, go outside, have a cigarette, go back in, watch TV, that's it, all day." Id. at 578. Plaintiff admitted he had served a thirty-day jail sentence for DUI in October of 2002. Id. at 578. Plaintiff testified that, while in jail, he had worked in the jail kitchen assembling box lunches for "Tent City" inmates. Id. at 579.

Plaintiff further testified that he had once had a problem with cocaine use, but that he had last used cocaine in August of 2002. Id. at 579. Plaintiff also admitted he used marijuana on a daily basis, and that he drank a 12-pack of beer a week. Id. at 580. Plaintiff averred that his cocaine, marijuana, and alcohol use, did not contribute to his termination from his employment as a travel agent in 2002. Id. at 581. Plaintiff also testified that he experienced drowsiness as a result of taking Remeron. Id. at 581.

At the hearing a Vocational Expert ("VE") testified that, with regard to Exhibit 6F, the mental Residual Functional Capacity Assessment of Dr. Amato, a person such as Mr. Meyer

-22-

with those limitations i.e., the need for a low-stress work environment, doing unskilled simple work, with very limited contact with the general public, could be a general cleaner or assembly worker. Id. at 583. The VE testified that, in reference to Exhibit 10F, the residual mental functional capacity assessed by Dr. Szekely, with additional limitations, the hypothetical could still perform the jobs of general cleaner or assembly worker. Id. at 584. The VE also testified that this hypothetical person, with additional postural limitations, could perform unskilled work available in the national economy, such as assembly worker or quality control inspector. Id. at 584-85.

In her written opinion finding Plaintiff not disabled, issued March 15, 2005, the ALJ concluded Plaintiff's "subjective allegations" were "less than fully credible based upon a lack of supportive objective findings. While the medical evidence of record shows the claimant has the aforementioned severe impairments, it fails to demonstrate the claimant's symptoms are as severe and as limiting as alleged." Id. at 28. The ALJ noted Plaintiff's complaint of back pain and numbness were belied by a November 2002 X-ray and Dr. Shapiro's opinion that there were no objective findings to support this complaint. Id.

The ALJ further stated:

The objective record demonstrates the claimant is capable of greater levels of physical and mental activity than alleged, further undermining his credibility. At the hearing, the claimant testified he has to lie down for three-to-four hours a day and watches television because he is exhausted and feels hopeless. He also said he still has two or three panic attacks a week. Progress notes dated December 10, 2003 reveal

the claimant had cut his finger making
candles []. On August 4, 2004, the claimant
stated he had been taking care of his sister,
who had recently undergone hip replacement
surgery [].

Despite complaints of poor concentration,
mental health progress notes consistently
reveal that he was alert []. On July 8,
2002, the claimant stated he was not taking
any medication and was not experiencing any
attention problems or obsessive behavior [].
On December 3, 2003 he had complained of high
levels of attention-deficit hyperactivity
disorder and anxiety, so in addition to
Remeron, he was prescribed Strattera. In two
weeks time, the claimant said he had noticed
a huge improvement in his mental symptoms.
Progress notes also consistently reveal the
claimant complained of no side effects from
his medications. On August 30, 2004, he
reported having a bad reaction to Seroquel,
but that was due to combining it with alcohol
[]. The undersigned also notes no unusual
anxiety or depression was noted at that
examination, and that the claimant's
neurological status was normal.

The claimant's statements concerning his drug
use are inconsistent and further undermine
his credibility. The claimant initially went
through cocaine detoxification in August 1999
at the Veterans Administration medical
facility. He checked himself in after a two-
month crack cocaine binge, having attempted
drug overdose on August 2, 1999 (sic). He
said he had lost his job and his home due to
drug use, and that he had become hopeless and
helpless after his sister had kicked him out
of her house for continued drug use. His
initial GAF was 50. He successfully detoxed
from cocaine and was discharged after a week
with a GAF of 70 and a prescription for
Celexa for depression []. The claimant was
jailed for thirty days in September 2002
after being arrested for driving while
intoxicated, which does not bolster his
credibility in any way.

Although the claimant said he experienced
better concentration with the use of
methamphetamine and cocaine, clinicians at
the Veterans Administration noted that his
drug use resulted in a failure to fulfill
major obligations at work and at home []. On
July 8, 2002, he told his mental health
counselor that he was self-medicating with
marijuana and alcohol and that he was unable
to maintain employment [].

-24-

Id. at 29.

The ALJ noted Plaintiff's recent mental health treatment notes indicated a decrease in his symptoms of ADHD and anxiety disorder when Plaintiff decreased his drug and alcohol use. Id. Accordingly, the ALJ concluded, "if [Plaintiff] were able to work as a travel agent when he was using drugs and alcohol, that his ability to do some sort of work would certainly improve if he were to completely abstain from substance abuse []." Id.

The ALJ noted the March 2004 opinion of Dr. Skelly stating Plaintiff was unable to work did not state any basis for this opinion nor was did it state specific limitations. Id. The ALJ noted Dr. Skelly's opinion Plaintiff was unable to work was contradicted by her treatment notes. Id. The ALJ stated she gave less weight to the opinion of Mr. Horning that Plaintiff was precluded from working "because it is not from an acceptable medical source and is otherwise unsupported by the greater objective record ..." Id. at 29-30.

With regard to Plaintiff's mental impairments, the ALJ determined Plaintiff could "perform simple, repetitive tasks, but he cannot perform coordination or supervisory activities requiring responsibility. He requires minimal contact with the public and cannot work for more than eight hours at a time." Id. at 30. The ALJ concluded Plaintiff could engage in light work activity "with limited exposure to other people []." Id. Based on the VE's testimony, the ALJ found Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy and, therefore, that

-25-

Plaintiff was not disabled at any time through the date of the decision.  Id. at 31.[6]

### V Analysis of Plaintiff's claims

**1. Plaintiff contends the ALJ erred by relying on opinions of nonexamining state agency reviewers who did not testify at hearing and did not adequately explain their findings and on the report of a one-time examination that did not meet the Commissioner's standards for agency consultative examinations.**

Plaintiff maintains Dr. Cunningham's assessment of Plaintiff's physical residual functional capacity did not comport with the Commissioner's standards for consultative examinations because, Plaintiff alleges, Dr. Cunningham was not provided with all of Plaintiff's medical records by the Social Security Administration.  Plaintiff asserts the Commissioner "unjustifiably utilized the services of a consultative examiner without attempting to obtain a report from the treating physician..."  Docket No. 17 at 6.  Plaintiff further asserts "the agency failed to send the examiner background medical records as required by the regulations."  Id.  Plaintiff argues that Dr. Cunningham's assessment is not "substantial evidence" supporting the physical residual functional capacity found by the ALJ because Dr. Cunningham relied on the same clinical findings as a "treating physician, but differ[ed] only in his [] conclusions..."  Id.

---

[6] The ALJ also noted:
The mere fact that as of August 4, 2004, the claimant continued to drink twelve beers a week and smoke marijuana demonstrates a lack of motivation for work activity [].  In terms of his claim that he is disabled due to his mental impairments, it also shows he has failed to meet his burden of showing he would not be disabled, as alleged, if he were to have stopped using drugs and alcohol within twelve months of his alleged onset date.
R. at 31.

Plaintiff also argues that, although the "ALJ purported to give "greater weight" to the opinion of Dr. Cunningham and probative weight to the non-examining, reviewing physicians, the RFC assessed by the ALJ was somehow erroneously in conformance with that of the non-examining physicians with regard to the amount of weight Plaintiff could lift.  Docket No. 17 at 7.[7]

The  Commissioner  responds  that  the  governing regulations "do  not  require  that  the  Agency  provide  the consultative  examiner  with  specific  treatment  records.  The regulations provide that the Agency will give the consultative examiner any necessary background information about a claimant's condition."  Docket No. 25 at 3.  Respondent also notes that Dr. Cunningham evidently had Plaintiff's medical records because he summarized Plaintiff's medical history.  Respondent also notes Dr. Cunningham appeared to have reviewed the clinical evidence in the record because he specifically refers to the December 2002 MRI.  Id. at 3-4.

The only statements from treating physicians concluding Plaintiff  was  completely  unable  to  work  were  the  summary statements of  Dr. Buyama and Dr. Skelly.  These opinions are summary  and  neither  provided  a  Residual  Functional  Capacity Assessment of Plaintiff's specific limitations with regard to work-related  activity.    The  ALJ  could  properly  rely  on  the

---

[7]
The  ALJ  decision,  founded  on  assumptions  not  supported  by substantial  evidence,  that  is,  upon  assessments  of  nonexamining physicians who did not testify at the hearing, did not review all of  the  evidence  of  record,  and  gave  cursory  explanations  for their  opinions,  and  a  report  of  a  one-time  examination  that  did not  comport  with  the  Commissioner's  standards  for  consultative examinations,  is  itself  not  supported  by  substantial  evidence.

physical residual functional capacity assessed by Dr. Cunningham, even to the extent Dr. Cunningham's conclusions differed from the non-examining physicians, because Dr. Cunningham's opinion regarding Plaintiff's residual functional capacity was based upon the independent clinical findings in the record and his own examination of Plaintiff. See Andrews v. Shalala, 53 F.3d at 1041.[8] Because no treating physician completed an assessment of Plaintiff's residual functional capacity, Dr. Cunningham's assessment did not conflict with that of a treating physician's.

Accordingly, even if Dr. Cunningham had not reviewed all of Plaintiff's medical records, the ALJ could have relied upon his opinion as an examining physician, provided it was based upon independent clinical findings and the background information necessary to formulate an opinion. See 20 C.F.R. §§ 404.1517 and 416.917 (2007). Dr. Cunningham's opinion was based on independent clinical findings, i.e., his own examination of Plaintiff, and background information necessary to formulate an opinion, i.e., MRIs of Plaintiff's spine.

Additionally, any error by the ALJ with regard to accepting Dr. Cunningham's residual functional capacity was harmless error. Plaintiff's counsel conceded at the hearing that the primary impediments to Plaintiff's ability to do

---

[8]
Independent clinical findings can be either (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence, [] or (2) findings based on objective medical tests that the treating physician has not herself considered... [].
Orn v. Astrue, 495 F.3d 625, 632-33 (9th Cir. 2007).

substantial gainful activity were his mental disabilities.  A disagreement about whether Plaintiff could lift twenty pounds or fifty pounds would not alter the ALJ's conclusion that Plaintiff was capable of sedentary labor.  Furthermore, at the time of the hearing before the ALJ, Plaintiff's physical residual functional capacity was not seen by Plaintiff or his counsel as a factor in his entitlement to disability benefits.  Both Petitioner and his counsel stated during the hearing that Plaintiff's primary impairment was his mental impairment.  Accordingly, any procedural error with regard to the evidence reviewed by Dr. Cunningham would have been harmless.

**2. Plaintiff asserts the ALJ erred by rejecting a treating nurse practitioner's assessment for insufficient reasons.**

Plaintiff argues the ALJ erred by giving less weight to the opinion of a psychiatric nurse practitioner, Mr. Horning, regarding his mental impairments.  Plaintiff notes the ALJ stated "that opinion was given less weight in this decision because it is not from an acceptable medical source and is otherwise unsupported by the greater objective record."  Plaintiff contends that the ALJ's conclusion that Mr. Horning was not "'an acceptable medical source'—is directly contrary to the Commissioner's rules, citing Social Security Ruling 06-03p.[9]

---

[9] The Social Security Ruling cited by Plaintiff states:
The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. [] Second, only "acceptable medical sources" can give us medical opinions. [] Third, only "acceptable medical sources" can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be

Plaintiff contends the term "'medical sources' refers to both 'acceptable medical sources' and other health care providers who are not 'acceptable medical sources'", citing 20 C.F.R. §§ 404.1502 and 416.902.

> Plaintiff argues that
>
> the mere fact N.P. Horning was not an "acceptable medical source" is alone insufficient to reject that treating source's assessment, which the ALJ herself admitted established disabling limitations. [] The second reason—the ALJ's belief N.P. Horning's assessment was "otherwise unsupported by the greater objective record" []—is virtually unreviewable, since the ALJ did not specify what in the "objective record" failed to support the treating source's assessment. The ALJ's belief the treating nurse practitioner's assessment was unsupported was an example of the ALJ "playing doctor."

Docket No. 17 at 9-10.

---

entitled to controlling weight.[]
***
"Other Sources"
In addition to evidence from "acceptable medical sources," we may use evidence from "other sources," as defined in 20 CFR 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. These sources include, but are not limited to:
• *Medical sources who are not* "*acceptable medical sources,*" *such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists*; ...
***
Information from these "other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.
Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Sources.

The Code of Federal Regulations distinguishes between those opinions coming from "acceptable medical sources" and those coming from "other sources." See 20 C.F.R. §§ 404.1513 & 416.913 (2007). Similar guidelines are provided for weighing conflicting opinions from acceptable medical sources, however, there are no specific guidelines for the weighing of opinions from "other sources." See Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996). This regulatory construction has been interpreted as permitting the Commissioner to accord opinions from "other sources" less weight than opinions from acceptable medical sources. See id.

A nurse practitioner, who has not attended medical school nor served a period of residency or internship, is not, pursuant to the Code of Federal Regulations, an "acceptable medical source" for an opinion regarding a claimant's residual functional capacity. See 20 C.F.R. § 404.1513(d(1) (2007) (excluding nurse practitioners from the list of "acceptable medical sources" whose opinions may be considered in determining the existence of an impairment). The opinion of a nurse practitioner as to a claimant's residual functional capacity is not entitled to as much weight as a non-examining, examining, or treating physician's opinion, but may be considered as an "other" source of information regarding the claimant's physical capacity. See, e.g., Lacroix v. Barnhart, 465 F.3d 881, 885-87 (8th Cir. 2006).

An ALJ may properly accord less weight to the opinion of an "other source" than to the opinion of an acceptable medical source. See, e.g., Gomez, 74 F.3d at 970-71. There was

no legal error by the ALJ when she exercised her discretion by according an other source opinion less weight than that of a medical opinion.   Any "evidentiary" conflict presented by Mr. Horning's opinion and the residual mental functional capacity found by Dr. Amato was appropriately resolved by the ALJ based on her review of the other medical source and non-medical source opinions in the record.   See Hardin v. Barnhart, 468 F. Supp. 2d 238, 250 (D. Mass. 2006).

The ALJ may also discount the testimony of an "other source" by providing reasons that are germane to that witness. Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).   The ALJ stated that she gave less weight to Mr. Horning's opinion because it was not in accordance with the weight of the evidence in the record.   The record of treatment notes from the Family Service Agency indicates Plaintiff's mental condition was generally improving, with only brief periods of sadness, with no apparent episodes of decompensation.   These notes, in addition to Dr. Amato's assessment, indicate Plaintiff was not nearly as mentally disabled or depressed or anxious as reported by Mr. Horning in his assessment that Plaintiff was completely incapable of any gainful employment.   Accordingly, the ALJ did not deviate from the guiding regulations when according the opinion of Mr. Horning less weight than that of the examining and reviewing psychiatrists when determining Plaintiff's residual functional mental capacity.

**3. Plaintiff argues the ALJ erred by discounting his testimony regarding the severity of his impairments because he failed to provide clear and convincing reasons for disbelieving Plaintiff.**

Plaintiff maintains: "There is simply no link between the ALJ rationale (sic) and rejection of Meyer's symptom testimony regarding mental impairments. The ALJ rationale (sic) did not satisfy the requirements for a credibility analysis." Docket No. 17 at 15.

An ALJ must provide "specific, cogent reasons," supported by substantial evidence in the record, for his disbelief of a claimant's statements regarding the claimant's disability. <u>Lester</u>, 81 F.3d at 834; <u>Bunnell</u>, 947 F.2d at 345. <u>See also</u> <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 (8th Cir. 1991). Unless there is affirmative evidence indicating that the claimant is actually malingering, the ALJ's reasons for rejecting the claimant's testimony must be clear and convincing. <u>See</u> <u>Lester</u>, 81 F.3d at 834; <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989). The ALJ must specifically identify what portion of the testimony in the record is credible and what testimony undermines the claimant's complaints. <u>See</u> <u>Lester</u>, 81 F.3d at 834; <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993).

> To determine whether the claimant's testimony regarding the severity of [his] symptoms is credible, the ALJ may consider, for example: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. In evaluating the credibility of the symptom

1          testimony, the ALJ must also consider the
2          factors set out in [Social Security Ruling]
           88-13.

3   <u>Smolen v. Chater</u>, 80 F.3d 1273, 1284 (9th Cir. 1996) (internal
4   citations omitted).

5          "Where ... the ALJ has made specific findings
6   justifying a decision to disbelieve an allegation ... and those
7   findings are supported by substantial evidence in the record,
8   our role is not to second-guess that decision." <u>Morgan v.</u>
9   <u>Commissioner of the Soc. Sec. Admin.</u>, 169 F.3d 595, 600 (9th
10  Cir. 1999).  Plaintiff's case is similar to the reported cases
11  in which the reviewing court held the ALJ's credibility
12  determination was supported by substantial evidence.  <u>See</u> <u>id.</u>;
13  <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1434 (9th Cir. 1995)
14  (upholding ALJ's credibility determination where claimant did
15  not receive medical treatment for three years and did not report
16  any mental limitations resulting from her condition but then
17  testified that pain and medication interfered with her ability
18  to think); <u>Curry v. Sullivan</u>, 925 F.2d 1127, 1130 (9th Cir.
19  1990) (finding that the claimant's testimony that "she was able
20  to take care of her personal needs, prepare easy meals, do light
21  housework, and shop for some groceries" was inconsistent with
22  her claimed inability to perform all work activity).

23         The ALJ gave numerous, specific instances supported by
24  the record, of why Plaintiff's claims of complete disability
25  were not credible.  The undersigned notes Plaintiff's claim that
26  his mental ailments render him completely unable to work are not
27  supported by the record in this matter, including the progress
28  notes from the Family Service Agency, which indicate Plaintiff's

-34-

mental condition generally improved with counseling and medication, with only occasional notations of Plaintiff experiencing anything approximating disabling anxiety after his alleged date of onset.

Plaintiff's claim in his disability benefits applications that his physical ailments rendered him unable to work for a period of more than one year is contradicted by all of the physicians' notes in the record before the ALJ and Plaintiff's own reports of his activities of daily living, including his statements that he was able to cook, clean, and shop. Additionally, even though Dr. Skelly opined Plaintiff could not work, her opinion in her notes was limited to a period of less than one year.

Plaintiff's claims that he is incapable of work because he is "hyper" and unable to concentrate are contradicted by his own testimony that he spends his day watching television and are more readily explained, as noted in the record, by his past and current drug and alcohol use. Plaintiff's allegations that he could no longer work due to disabling anxiety, i.e., that he was unable to handle any stress or pressure, is belied by the record evidence that he was fired from his employment due to his drug and alcohol use and it is plausible that the consumption of crack cocaine caused, in part, Plaintiff's ADHD symptoms. Plaintiff's claim that he is incapable of all gainful activity is also belied by the fact that Plaintiff worked several hours per day, presumably standing for a majority of that time, for approximately one month near the beginning of his alleged period of disability in the "Tent City" Maricopa County Jail.

Furthermore, the Court notes Plaintiff reported to his physicians at the Sonoran Medical Center that he had used crack cocaine "once," an indication of his lack of candor with even his medical care providers.

The ALJ's findings regarding Plaintiff's residual mental functional capacity were sufficiently stated and supported by substantial evidence in the record. See Morgan, 169 F.3d at 599 (holding ALJ properly discredited the claimant's credibility by citing a medical report that indicated the claimant's mental symptoms improved with medication); Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000); Diaz v. Chater, 55 F.3d 300, 307-08 (7th Cir. 1995) ("ALJ need not provide a complete written evaluation of every piece of testimony and evidence"). Compare Groeper v. Sullivan, 932 F.2d 1234, 1239 (8th Cir. 1991). Any error on the part of the ALJ to more thoroughly explain her conclusions regarding Plaintiff's credibility were clearly harmless.

### VI    Conclusion

The Court concludes there is sufficient relevant evidence in the record as reasonable minds might accept as adequate support for the ALJ's conclusion that Plaintiff is not "disabled" as that term is defined by the relevant federal statutes. Accordingly, the ALJ's conclusion Plaintiff's impairments do not render him completely unable to work should not be reversed.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary Judgment (Docket No. 16) is **DENIED**, and Defendant's cross-motion for summary judgment (Docket No. 23) is **GRANTED**. Judgment shall be entered in favor of Defendant and against Plaintiff with regard to the charges stated in the complaint.

**IT IS FURTHER ORDERED** that, as a result of the Court's determination that judgment in favor of Defendant is appropriate, the Clerk of the Court shall enter judgment accordingly.

DATED this 18th day of March, 2008.


_____
Mark E. Aspey
United States Magistrate Judge